# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

———————————

STATE OF FLORIDA,
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION,
FLORIDA DEPARTMENT OF MANAGEMENT SERVICES,

Plaintiffs-Appellees,

and

CATHOLIC MEDICAL ASSOCIATION,

Plaintiff-Appellee-Cross-Appellant,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants-Appellants-Cross-Appellees.

———————————

On Appeal from the United States District Court
for the Middle District of Florida

———————————

**BRIEF FOR APPELLANTS/CROSS-APPELLEES**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

CHARLES W. SCARBOROUGH
ASHLEY C. HONOLD
*Attorneys, Appellate Staff
Civil Division, Room 7261
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-9018*

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for defendants-appellants-cross-appellees the U.S. Department of Health and Human Services; Centers for Medicare and Medicaid Services; Secretary, Department of Health and Human Services, in his official capacity; Administrator, Centers for Medicare & Medicaid Services, in her official capacity; Director, Office for Civil Rights, in her official capacity certify that the following have an interest in the outcome of this appeal:

Alliance Defending Freedom

Becerra, Xavier, Secretary, Department of Health and Human Services

*Bennett, Michelle R., U.S. Department of Justice

Blake, Julie Marie, Alliance Defending Freedom

Bowman, Matthew S., Alliance Defending Freedom

Boyden Gray, PLLC

Boynton, Brian M., U.S. Department of Justice

Brooks-Lasure, Chiquita, Administrator, Centers for Medicare & Medicaid Services

Catholic Medical Association State of Florida

Centers for Medicare and Medicaid Services

Christmas, Natalie, Office of the Florida Attorney General

Conde, James, Boyden Gray, PLLC

* Additions to previous certificate marked with an asterisk.

Cortman, David Andrew, Alliance Defending Freedom

Florida Agency For Health Care Administration

Florida Attorney General Service

Florida Department of Management Services

Guard, John Matthew, Quarles & Brady, LLP

Holland, Liam C., U.S. Department of Justice

Honold, Ashley Cheung, U.S. Department of Justice

*Humphreys, Bradley P., U.S. Department of Justice

*Jung, William F., U.S. District Court for the Middle District of Florida

Larson, Kristen, Florida Department of Management Services

*Marcus, Lisa Zeidner, U.S. Department of Justice

McCotter, R. Trent, Boyden Gray, PLLC

*Newman, Jeremy S.B., U.S. Department of Justice

Percival, James Hamilton, II, Office of the Florida Attorney General

Pope, Allison Holly, Alliance Defending Freedom

Quarles & Brady, LLP

Rainer, Melanie Fontes, Director, Office for Civil Rights, Department of Health and Human Services

Scarborough, Charles W., U.S. Department of Justice

Sheeran, Andrew Taylor, Florida Agency for Health Care Administration

Sherwood, Zachary, U.S. Department of Justice

U.S. Department of Health and Human Services

Whitaker, Henry Charles, Office of the Florida Attorney General

## STATEMENT REGARDING ORAL ARGUMENT

The district court's preliminary injunction and stay order prevents the Department of Health and Human Services from implementing an important rule that is necessary to fully effectuate Section 1557's prohibition against sex discrimination in health programs. Because the district court's analysis is inconsistent with decisions from numerous other federal courts of appeals and district courts, the government believes that oral argument would aid in the consideration of this appeal.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................1

STATEMENT OF JURISDICTION ...........................................................................3

STATEMENT OF THE ISSUE....................................................................................3

STATEMENT OF THE CASE.....................................................................................4

      A.    Statutory and Regulatory Background..........................................................4

      B.    Prior Proceedings...........................................................................................9

      C.    Related Litigation .......................................................................................11

SUMMARY OF ARGUMENT...................................................................................14

ARGUMENT ...............................................................................................................16

I.    Plaintiffs Are Unlikely to Prevail on the Merits of Their Challenges.................16

      A.    Gender-Identity Discrimination Is Necessarily a Form of
            Discrimination on the Basis of Sex..............................................................16

      B.    Plaintiffs' Challenge Is Unripe...................................................................25

II.    At a Minimum, the Injunction and Stay Are Overbroad ...................................31

CONCLUSION ............................................................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                        **Page(s)**

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ...................................................................................26

*A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville,*
  75 F.4th 760 (7th Cir. 2023) ....................................................................19

*Adams ex rel. Kasper v. School Bd. of St. Johns Cty.,*
  57 F.4th 791 (11th Cir. 2022) .................................................10, 14, 19, 20, 22

*Alabama v. Cardona,*
  No. 7:24-cv-533-ACA, 2024 WL 3607492 (N.D. Ala. July 30, 2024),
  *appeal docketed,* No. 24-12444 (11th Cir. July 30, 2024) ................................12

*Alliance for Hippocratic Med. v. U.S. Food & Drug Admin.,*
  78 F.4th 210 (5th Cir. 2023), *rev'd on other grounds,*
  602 U.S. 367 (2024) ...................................................................................14

*Arkansas v. U.S. Dep't of Educ.,*
  __F. Supp. 3d__, No. 4:24-cv-636-RWS,
  2024 WL 3518588 (E.D. Mo. July 24, 2024), *appeal docketed,*
  No. 24-2921 (8th Cir. Sept. 23, 2024) .....................................................13

*Arnold, Constable & Co. v. United States,*
  147 U.S. 494 (1893) ...................................................................................21

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) .........................................................2, 5, 6, 14, 15, 18, 19,
                                                                                21, 22, 23, 24, 25, 31

*Braidwood Mgmt., Inc. v. EEOC,*
  70 F.4th 914 (5th Cir. 2023) ....................................................................24

*Brandt ex rel. Brandt v. Rutledge,*
  47 F.4th 661 (8th Cir. 2022) ....................................................................25

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ...................................................................................31

*Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*,
    __F. Supp. 3d__, No. 4:24-cv-00461-O,
    2024 WL 3381901 (N.D. Tex. July 11, 2024), *appeal docketed*,
    No. 24-10824 (5th Cir. Sept. 10, 2024) ...........................................13

*Eknes-Tucker v. Governor of Alabama*,
    80 F.4th 1205 (11th Cir. 2023) ...........................................10, 15, 22

*Franklin v. Gwinnett Cty. Pub. Sch.*,
    503 U.S. 60 (1992) ...........................................24

*Gill v. Whitford*,
    585 U.S. 48 (2018) ...........................................16

*Gonzalez v. Governor of Georgia*,
    978 F.3d 1266 (11th Cir. 2020) ...........................................13

*Grabowski v. Arizona Bd. of Regents*,
    69 F.4th 1110 (9th Cir. 2023) ...........................................19

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir.), *as amended* (Aug. 28, 2020)...........................................19

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009) ...........................................25

*Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*,
    922 F.2d 756 (11th Cir. 1991 ...........................................26

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ........................................... 1, 1-2, 22

*Kansas v. U.S. Dep't of Educ.*,
    __F. Supp. 3d__, No. 24-cv-4041-JWB,
    2024 WL 3273285 (D. Kan. July 2, 2024), *appeal docketed*,
    No. 24-3097 (10th Cir. July 11, 2024) ...........................................13

*Labrador v. Poe ex rel. Poe*,
    144 S. Ct. 921 (2024) ...........................................31

*Lakoski v. James*,
    66 F.3d 751 (5th Cir. 1995) ...........................................18

*Meritor Sav. Bank, FSB v. Vinson,*
477 U.S. 57 (1986) ...............................................................................24

*Mulhall v. UNITE HERE Local 355,*
618 F.3d 1279 (11th Cir. 2010)............................................................26

*National Park Hosp. Ass'n v. Department of the Interior,*
538 U.S. 803 (2003) ....................................................................... 27, 30

*Ohio Forestry Ass'n v. Sierra Club,*
523 U.S. 726 (1998) .............................................................................30

*Oklahoma v. Cardona,*
__F. Supp. 3d__, No. 5:24-cv-00461-JD,
2024 WL 3609109 (W.D. Okla. July 31, 2024), *appeal docketed,*
No. 24-6205 (10th Cir. Sept. 27, 2024) .............................................13

*Pederson v. Louisiana State Univ.,*
213 F.3d 858 (5th Cir. 2000)................................................................24

*Seminole Tribe of Fla. v. Florida,*
517 U.S. 44 (1996) ...............................................................................23

*Tennessee v. Becerra,*
__F. Supp. 3d__, No. 1:24-cv-161-LG-BWR,
2024 WL 3283887 (S.D. Miss. July 3, 2024)....................................12

*Tennessee v. Cardona,*
__F. Supp. 3d__, No. 2:24-cv-072-DCR,
2024 WL 3019146 (E.D. Ky. June 17, 2024), *appeal docketed,*
No. 24-5588 (6th Cir. June 26, 2024) .................................................13

*Texas v. Becerra,*
__F. Supp. 3d__, No. 6:24-cv-211-JDK,
2024 WL 3297147 (E.D. Tex. July 3, 2024), *modified on reconsideration,*
2024 WL 4490621 (E.D. Tex. Aug. 30, 2024) ..................................12

*Texas v. United States,*
__F. Supp. 3d__, No. 2:24-cv-86-Z,
2024 WL 3405342 (N.D. Tex. July 11, 2024), *appeal docketed,*
No. 24-10832 (5th Cir. Sept. 13, 2024) .............................................13

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ...............................................................26, 27, 30


**U.S. Constitution:**
Art. III, § 2, cl. 1 .................................................................................25


**Statutes:**
Affordable Care Act:
    42 U.S.C. § 18116(a).............................................. 4, 10, 16, 29
    42 U.S.C. § 18116(c).........................................................................4

Title IX of the Education Amendments of 1972,
    20 U.S.C. § 1681 *et seq.* ................................................................5
        20 U.S.C. § 1681(a) ........................................ 4, 16, 18, 23
        20 U.S.C. §§ 1682-1683 ..............................................................4
        20 U.S.C. § 1683..........................................................................29
        20 U.S.C. § 1686..........................................................................21

Title VII of the Civil Rights Act of 1964:
    42 U.S.C. § 2000e-2(a)(1)........................................... 5, 18
    42 U.S.C. § 2000e-2(e) ...............................................................21

5 U.S.C. § 705.................................................................................2, 9, 14

28 U.S.C. § 1292(a)(1) ...................................................................3

28 U.S.C. § 1331 ...............................................................................3

28 U.S.C. § 1346 ...............................................................................3

28 U.S.C. § 1361 ...............................................................................3


**Regulatory Materials:**

34 C.F.R. § 106.33 ...........................................................................20

42 C.F.R. § 438.3(d)(4)...........................................................8, 9, 17

45 C.F.R. § 80.7 ............................................................................................29

45 C.F.R. § 80.7(a)-(d) .....................................................................................4

45 C.F.R. § 80.7(c) ..........................................................................................29

45 C.F.R. § 80.7(d)(1) .....................................................................................29

45 C.F.R. § 80.8(a) .................................................................................... 4, 29

45 C.F.R. § 80.8(c) ..........................................................................................29

45 C.F.R. § 80.8(d) ..........................................................................................29

45 C.F.R. § 80.9 ..............................................................................................29

45 C.F.R. § 80.11 ............................................................................................29

45 C.F.R. § 86.71 ............................................................................................29

45 C.F.R. § 92.5 ................................................................................................8

45 C.F.R. § 92.5(a) ..........................................................................................29

45 C.F.R. § 92.6 ................................................................................................8

45 C.F.R. § 92.7 ................................................................................................9

45 C.F.R. § 92.8 ................................................................................................9

45 C.F.R. § 92.9 ................................................................................................9

45 C.F.R. § 92.10 ..............................................................................................9

45 C.F.R. § 92.101(a)(2) .............................................................................. 6, 16

45 C.F.R. § 92.101(a)(2)(iv) ..................................................................... 1, 9, 10

45 C.F.R. § 92.206 ............................................................................................6

45 C.F.R. § 92.206(a) ........................................................................................6

45 C.F.R. § 92.206(b) ....................................................................9, 10, 17

45 C.F.R. § 92.206(b)(1) ..............................................................................7

45 C.F.R. § 92.206(b)(4) ..............................................................................7

45 C.F.R. § 92.206(c) ............................................................................ 7, 28

45 C.F.R. § 92.207 ........................................................................................6

45 C.F.R. § 92.207(b)(3)-(4) ........................................................................7

45 C.F.R. § 92.207(b)(3)-(5) ..............................................................9, 10, 17

45 C.F.R. § 92.207(c) ............................................................................. 8, 28

45 C.F.R. § 92.303(a) ...................................................................................4

Exec. Order No. 13,988,
   86 Fed. Reg. 7023 (Jan. 25, 2021) ........................................................5

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ...........................................................................3

**Other Authorities:**

81 Fed. Reg. 31,376 (May 18, 2016) ..........................................................4

85 Fed. Reg. 37,160 (June 19, 2020) ..........................................................4

86 Fed. Reg. 27,984 (May 25, 2021) ..........................................................5

87 Fed. Reg. 47,824 (Aug. 4, 2022) ...........................................................5

*Nondiscrimination in Health Programs and Activities,*
   89 Fed. Reg. 37,522 (May 6, 2024)..................1, 6, 8, 9, 17, 19, 20, 27, 28

*Nondiscrimination on the Basis of Sex in Education Programs or Activities*
   *Receiving Federal Financial Assistance,*
   89 Fed. Reg. 33,474 (Apr. 29, 2024) ...................................................12

**INTRODUCTION**

Section 1557 of the Affordable Care Act prohibits various forms of discrimination in health programs and activities that receive federal financial assistance. The statute does so by incorporating the grounds of discrimination prohibited in various other federal civil rights statutes, including Title IX of the Education Amendments of 1972. Title IX, in turn, prohibits sex discrimination in federally funded education programs and activities. As the Supreme Court has made clear, "Congress gave [Title IX] a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).

Congress authorized the Department of Health and Human Services (HHS) to issue regulations to implement Section 1557's prohibition on sex discrimination and the other grounds of prohibited discrimination in health programs and activities. In May 2024, HHS exercised that delegated authority by issuing a rule promulgating new implementing regulations for Section 1557. *See Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522 (May 6, 2024) (Rule). As relevant here, 45 C.F.R. § 92.101(a)(2)(iv) clarifies that discrimination on the basis of gender identity is necessarily a form of discrimination on the basis of sex. And the Rule contains several provisions explaining how the prohibition on gender-identity discrimination applies in the context of providing healthcare and health insurance coverage. Those provisions effectuate Title IX's "broad" prohibition on sex discrimination, *Jackson*, 544 U.S. at

175—as imported into the health context by Section 1557—and are consistent with precedent of this Court and the Supreme Court.

Plaintiffs' challenge to these provisions is meritless. Section 92.101(a)(2)(iv) flows directly from the plain text of Title IX and the reasoning of the Supreme Court's decision in *Bostock v. Clayton County*, which recognizes that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 590 U.S. 644, 660 (2020). That essential insight—which the Supreme Court held followed unambiguously from the plain meaning of the phrase "because of sex"—is not confined to Title VII; it applies equally to Title IX's prohibition against discrimination "on the basis of sex," as incorporated by Section 1557.

The district court nevertheless entered an order barring HHS from "instituting or pursuing any enforcement proceedings under Section 1557" in the State of Florida "based the interpretation of discrimination 'on the basis of sex'" in the Rule defining sex discrimination to include gender identity discrimination, and staying the effective date of relevant provisions in their entirety under 5 U.S.C. § 705 in the State of Florida. In so doing, the court erred by refusing to apply *Bostock*'s central teaching to the materially indistinguishable language of Title IX. And the court failed to justify granting relief that extends well beyond the circumstances in which plaintiffs have asserted any irreparable harm.

This Court should vacate the preliminary injunction and stay order.

## STATEMENT OF JURISDICTION

Plaintiffs asserted jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361. Dkt. No. 1, at 10.[1] The district court entered a preliminary injunction and stay order on July 3, 2024. Dkt. No. 41. Defendants timely appealed on August 30, 2024. Dkt. No. 46; Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

In May 2024, HHS issued a rule promulgating new regulations implementing Section 1557 of the Affordable Care Act. After finding that plaintiffs were likely to succeed on their challenge to the inclusion of gender-identity discrimination under the Rule, the district court stayed the effective date of the Rule in the State of Florida with respect to certain challenged provisions and preliminarily enjoined HHS from instituting or pursuing in the State of Florida any enforcement proceedings Under Section 1557 based on the interpretation of discrimination "on the basis of sex" in the Rule. The question presented is whether the district court erred in entering the preliminary injunction and § 705 stay.

---

[1] District court documents are cited as "Dkt. No. #, at #," where the page number refers to the CM/ECF pagination.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

Section 1557 of the Affordable Care Act provides that "an individual shall not, on the ground prohibited under" various other civil rights statutes "be subjected to discrimination under, any health program or activity" receiving federal financial assistance.  42 U.S.C. § 18116(a).  One of the specified statutes is Title IX of the Education Amendments of 1972, which provides that "[n]o person . . . shall, on the basis of sex" "be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Congress authorized HHS to "promulgate regulations to implement [Section 1557]."  42 U.S.C. § 18116(c).  And Congress established a detailed administrative enforcement scheme requiring HHS to first attempt to secure compliance through voluntary means before it may suspend or terminate federal financial assistance, or refer a matter to the Department of Justice for enforcement.  *See* 20 U.S.C. §§ 1682-1683 (incorporated by 42 U.S.C. § 18116(a)); *see also* 45 C.F.R. §§ 80.7(a)-(d), 80.8(a); *id.* § 92.303(a).

HHS promulgated regulations implementing Section 1557's prohibition on sex discrimination in 2016, and again in 2020.  *See* 81 Fed. Reg. 31,376 (May 18, 2016) (2016 Rule); 85 Fed. Reg. 37,160 (June 19, 2020) (2020 Rule) (rescinding the 2016 Rule's provisions defining sex discrimination).  Three days after HHS submitted the 2020 Rule for publication in the Federal Register, the Supreme Court held that the prohibition on discrimination "because of … sex" in Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation or gender identity. *See Bostock v. Clayton County*, 590 U.S. 644, 660 (2020). Following *Bostock*, and after a change in administration, the President issued an executive order explaining that "[u]nder *Bostock*'s reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. [§] 1681 *et seq.*), … —prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg. 7023, 7023 (Jan. 25, 2021) (citations omitted). The President thus directed agencies to "consider whether to" take any actions "necessary to fully implement statutes that prohibit sex discrimination," "consistent with applicable law." *Id.* at 7024. In May 2021, HHS issued a notification to inform the public that, consistent with *Bostock* and Title IX, HHS would interpret and enforce Section 1557's prohibition on sex discrimination as including discrimination based on sexual orientation and gender identity. 86 Fed. Reg. 27,984 (May 25, 2021).

In July 2022, HHS issued a Notice of Proposed Rulemaking, which—among other things—proposed to interpret Section 1557's prohibition against sex discrimination to include discrimination based on gender identity. 87 Fed. Reg. 47,824 (Aug. 4, 2022). Following an extensive public engagement process, HHS issued the final Rule on May 6, 2024. The Rule made numerous changes to the Section 1557 regulations.

As particularly relevant here, the Rule contains a number of provisions pertinent to the statutory prohibition on sex discrimination. Section 92.101(a)(2) describes the scope of prohibited sex discrimination under Section 1557. It provides that "[d]iscrimination on the basis of sex includes, but is not limited to, discrimination on the basis of: (i) Sex characteristics, including intersex traits; (ii) Pregnancy or related conditions; (iii) Sexual orientation; (iv) Gender identity; and (v) Sex stereotypes." 45 C.F.R. § 92.101(a)(2). HHS explained that "the inclusion of 'sexual orientation' and 'gender identity' in § 92.101(a)(2) is consistent with the Supreme Court's reasoning in *Bostock*." 89 Fed. Reg. at 37,574. And HHS determined that it was "not necessary to define 'sex' in this rule," observing that in *Bostock* the "Supreme Court did not define the term 'sex'"; instead the Court explained that nothing in its analysis "turned on the debate over whether 'sex' was limited to 'biological distinctions between male and female,' and the Court therefore proceeded on the assumption that 'sex' carried that meaning." *Id.* at 37,575 (quoting *Bostock*, 590 U.S. at 655).

The Rule also addresses equal program access on the basis of sex, 45 C.F.R. § 92.206, and insurance coverage, *id.* § 92.207. Section 92.206 applies primarily to those that provide direct healthcare services to patients, such as hospitals, and requires the provision of "equal access to [a provider's] health programs and activities without discriminating on the basis of sex." *Id.* § 92.206(a). For instance, § 92.206(b)(1) provides that covered providers must not "[d]eny or limit health services … to an individual based upon the individual's sex assigned at birth, gender identity, or gender

otherwise recorded." *Id.* § 92.206(b)(1). Accordingly, under (b)(1), a healthcare provider could not refuse to treat the broken arm of a transgender patient because of that patient's gender identity. Another provision within this section additionally precludes covered providers from denying or limiting health services sought for the purpose of gender-affirming care "that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." *Id.* § 92.206(b)(4). Section 92.206 explains, however, that it does not "require[] the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where … the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual." *Id.* § 92.206(c). This provision thus makes clear that no violation of Section 1557 occurs where the denial is based on "a legitimate, nondiscriminatory reason" and not "unlawful animus or bias," or does not "constitute a pretext for discrimination." *Id.*

Section 92.207 contains specific prohibitions applicable to covered entities that provide insurance or other health-related coverage, including provisions prohibiting insurance issuers from "deny[ing] or limit[ing] coverage" "based upon" an individual's "gender identity," and precluding insurance issuers from "hav[ing] or implement[ing] a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care." 45 C.F.R. § 92.207(b)(3)-(4). Again, however, § 92.207 makes clear that it does not "require[] coverage of any health service

7

where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting coverage of the health service or determining that such health service fails to meet applicable coverage requirements, including reasonable medical management techniques such as medical necessity requirements." *Id.* § 92.207(c). As with program access under § 92.206, a "coverage denial or limitation must not be based on unlawful animus or bias, or constitute a pretext for discrimination." *Id.* Where a "medical necessity determination" to deny coverage constitutes a "bona fide medical judgment," it would not amount to impermissible discrimination under § 92.207. *See* 89 Fed. Reg. at 37,613.

Beyond these provisions explaining how the prohibition on gender-identity discrimination applies in the context of providing healthcare and health insurance coverage, the Rule contains a number of provisions that are relevant to implementing the prohibition on sex discrimination more generally—without specific regard to whether that prohibition covers gender identity or gender-affirming care.[2] *See, e.g.*, 45 C.F.R. § 92.5 (requiring assurance of nondiscrimination); *id.* § 92.6 (addressing

---

[2] The Rule also revised nondiscrimination provisions of certain Centers for Medicare & Medicaid Services (CMS) regulations governing Medicaid, Programs of All-Inclusive Care for the Elderly, the Children's Health Insurance Program (CHIP), health insurance exchanges, and certain plans in the commercial health insurance market. *See* 89 Fed. Reg. at 37,666-75. For example, those CMS regulations require contracts between states and Medicaid and CHIP managed care plans to include provisions that preclude discrimination against enrollees. As relevant here, § 438.3(d)(4) adds discrimination on the basis of gender identity to the list of provisions prohibiting sex-based discrimination that must be included in such contracts. 42 C.F.R. § 438.3(d)(4).

remedial and voluntary actions by recipients); *id.* § 92.7 (requiring Section 1557 coordinator); *id.* § 92.8 (requiring written nondiscrimination policy); *id.* § 92.9 (governing training); *id.* § 92.10 (addressing notice of nondiscrimination). The Rule's effective date was July 5, 2024 (unless otherwise specified for certain provisions). 89 Fed. Reg. at 37,693.

## B.     Prior Proceedings

Plaintiffs are the State of Florida, the Florida Agency for Health Care Administration, the Florida Department of Management Services, and the Catholic Medical Association, which is an association of Catholic healthcare providers that brought suit on behalf of its members. Dkt. No. 1, at 7-8 (Complaint). Plaintiffs challenged the Rule's treatment of gender-identity discrimination and sought a preliminary injunction and a stay of the Rule's effective date, claiming that the application of the Rule with respect to the provision of gender-affirming care and sex-segregated facilities will cause them irreparable harm. *See id.* at 64-81; Dkt. No. 12, at 20-23.

On July 3, 2024, the district court stayed the Rule in part under 5 U.S.C. § 705, postponing the effective dates of several provisions pertaining to gender-identity discrimination: 45 C.F.R. §§ 92.101(a)(2)(iv) (which defines sex discrimination to include gender identity discrimination), 92.206(b) (which covers equal program access on the basis of sex), 92.207(b)(3)-(5) (which applies to gender-identity discrimination in the provision of health insurance), and 42 C.F.R. § 438.3(d)(4) (which defines

prohibited sex discrimination in managed care contracts under Medicaid and CHIP to encompass gender-identity discrimination). Dkt. No. 41, at 49 (District Court Opinion). The court also issued a preliminary injunction barring HHS from "instituting or pursuing any enforcement proceedings under Section 1557, 42 U.S.C. § 18116(a), based on the interpretation of discrimination 'on the basis of sex' to be codified at 45 C.F.R. § 92.101(a)(2)(iv), 92.206(b), or 92.207(b)(3)-(5)." *Id.*

The district court first determined that plaintiffs' claims were justiciable. The court concluded that Florida has standing, and it further concluded that plaintiffs' claims were ripe, reasoning that Florida is the object of the regulation, the challenge does not require factual development, and Florida faces sufficient hardship by being forced to choose between changing its policies or risking lawsuits and the loss of funds. Dkt. No. 41, at 14-17.

The court held that Florida plaintiffs were substantially likely to succeed on the merits of their claim that the Rule exceeded statutory authority by interpreting Section 1557 to prohibit discrimination based on gender identity. Dkt. No. 41, at 20-28. The court relied on *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791, 812-15 (11th Cir. 2022) (en banc), which the court interpreted to stand for the proposition that "Title IX does not address discrimination on the basis of gender identity." Dkt. No. 41, at 20. The court also relied on *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), which held that a state law banning gender-affirming care for

minors did not discriminate based on sex and thus did not trigger heightened scrutiny under the Equal Protection Clause. Dkt. No. 41, at 23-26.

As to the remaining factors, the court concluded that plaintiffs face irreparable harm in the form of the costs required to amend their policies and come into compliance with the Rule and the need to violate or repeal state law to do so. Dkt. No. 41, at 28-32. Finally, the district court concluded that the balance of harms and public interest favors a stay, noting that the government has no interest in implementing an unlawful Rule and that the "ever-changing and unstable" agency positions in this space suggest little harm to HHS from a delay. *Id.* at 32-38.

The district court thus concluded that the Florida plaintiffs were entitled to preliminary injunctive relief and a stay of the relevant provisions of the Rule within Florida. However, the district court denied the Catholic Medical Association's request for preliminary injunctive relief as to its members. In doing so, the court observed that it did not know who all the members were, that there would be problems trying to enforce an injunction based on Eleventh Circuit precedent with respect to members practicing within other circuits, and that the Supreme Court and Eleventh Circuit had recently criticized nationwide injunctions. Dkt. No. 41, at 47-48.

## C.     Related Litigation

**1.** Several other challenges to the Section 1557 Rule are currently pending in other courts. *See Tennessee v. Becerra*, No. 24-60462 (5th Cir. filed Sept. 5, 2024) (opening brief filed Nov. 21, 2024); *Texas v. Becerra*, No. 24-40568 (5th Cir. filed Sept. 5, 2024)

(opening brief filed Nov. 27, 2024); *Catholic Benefits Ass'n v. Becerra*, No. 3:23-cv-203 (D.N.D. filed Oct. 13, 2023) (dispositive motions pending); *McComb Children's Clinic, Ltd. v. Becerra*, No. 5:24-cv-48 (S.D. Miss. filed May 13, 2024) (dispositive motions pending); *Missouri v. Becerra*, No. 4:24-cv-937 (E.D. Mo. filed July 10, 2024) (awaiting scheduling order). Two other district courts have issued similar orders staying the effective date of portions of the Rule under 5 U.S.C. § 705, in addition to preliminarily enjoining its enforcement. *See Tennessee v. Becerra*, __F. Supp. 3d__, No. 1:24-cv-161-LG-BWR, 2024 WL 3283887 (S.D. Miss. July 3, 2024); *Texas v. Becerra*, __F. Supp. 3d__, No. 6:24-cv-211-JDK, 2024 WL 3297147 (E.D. Tex. July 3, 2024), *modified on reconsideration*, 2024 WL 4490621 (E.D. Tex. Aug. 30, 2024).

    **2.** There is ongoing litigation raising similar legal questions in cases challenging a final rule issued by the Department of Education that implements Title IX's prohibition on sex discrimination in education programs. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024). Similar to the Section 1557 Rule, the Title IX rule also clarifies that discrimination on the basis of gender identity is necessarily a form of discrimination on the basis of sex. Particularly relevant here is one of the challenges to the Title IX rule currently pending in this Court. *See Alabama v. Cardona*, No. 7:24-cv-533-ACA, 2024 WL 3607492 (N.D. Ala. July 30, 2024) (denying preliminary injunction), *appeal docketed*, No. 24-12444 (11th Cir. July 30, 2024) (oral argument held Dec. 18,

2024).[3]  In *Alabama*, the district court denied the plaintiffs' motion for a preliminary injunction, and plaintiffs appealed.  This Court granted the plaintiffs' motion for an administrative injunction and then granted the plaintiffs' motion for an injunction pending appeal on August 22, 2024.  This Court heard oral argument on December 18, 2024.

### D.    Standard of Review

This Court reviews the district court's grant of a preliminary injunction for an abuse of discretion, but "any underlying legal conclusions" are reviewed de novo. *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270 (11th Cir. 2020).  Courts apply the preliminary-injunction factors and the same standard of review in evaluating stays under

---

[3] Numerous other challenges to the Title IX rule are pending in cases around the country.  *See Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*, No. 24-30399 (5th Cir. filed June 25, 2024) (oral argument held Nov. 4, 2024); *Tennessee v. Cardona*, __F. Supp. 3d__, No. 2:24-cv-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-5588 (6th Cir. June 26, 2024) (oral argument held Oct. 30, 2024); *Kansas v. U.S. Dep't of Educ.*, __F. Supp. 3d__, No. 24-cv-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-3097 (10th Cir. July 11, 2024) (reply brief filed Oct. 29, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, __F. Supp. 3d__, No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-10824 (5th Cir. Sept. 10, 2024) (appeal stayed); *Texas v. United States*, __F. Supp. 3d__, No. 2:24-cv-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-10832 (5th Cir. Sept. 13, 2024) (appeal stayed); *Arkansas v. U.S. Dep't of Educ.*, __F. Supp. 3d__, No. 4:24-cv-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-2921 (8th Cir. Sept. 23, 2024) (opening brief filed Nov. 18, 2024); *Oklahoma v. Cardona*, __F. Supp. 3d__, No. 5:24-cv-00461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-6205 (10th Cir. Sept. 27, 2024) (opening brief filed Nov. 19, 2024).

5 U.S.C. § 705.  *See Alliance for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 242 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024).

## SUMMARY OF ARGUMENT

**I.**     The district court erred in holding that the Rule is likely unlawful as to several provisions pertaining to gender-identity discrimination.

**A.**     The Rule's provision addressing the scope of prohibited sex discrimination (§ 92.101(a)(2)) properly recognizes that gender-identity discrimination is necessarily a form of sex discrimination.  That conclusion follows directly from the plain text of Title IX, which Section 1557 incorporates as relevant here, and from the reasoning of *Bostock v. Clayton County*, 590 U.S. 644 (2020), which interpreted materially identical language in Title VII and concluded that gender-identity discrimination necessarily involves sex discrimination.  That is so, as *Bostock* made clear, even assuming that "sex" is understood to refer only to "biological distinctions between male and female."  *Id.* at 655.

None of the district court's reasons for distinguishing *Bostock* withstands scrutiny. The district court based its decision on *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) (en banc), but the holding and reasoning of *Adams* were limited to the specific context of sex-separate facilities.  *See id.* at 815.  This Court did not address in *Adams* whether Title IX prohibits gender-identity discrimination outside of that specific context.  Moreover, Title IX's various exemptions do not suggest that its core prohibition against discrimination "on the basis of sex" is different

14

from Title VII's core prohibition on discrimination "because of sex." The district court ran afoul of basic rules of statutory interpretation in concluding that "sex discrimination" carries different meanings in statutes using materially identical language.

The court was also wrong to conclude that the Spending Clause precludes the Rule's recognition that the prohibition against sex discrimination in Section 1557 encompasses gender-identity discrimination. As the Supreme Court made clear in *Bostock*, the conclusion that gender-identity discrimination is a form of sex discrimination flows clearly from a statutory prohibition against discrimination based on sex, even assuming that the definition of sex is limited to "biological distinctions between male and female." 590 U.S. at 655. Because Title IX and Section 1557 use materially identical language that likewise unambiguously prohibits discrimination on the basis of gender identity, clear-statement principles premised on the Spending Clause do not apply to the Rule. The district court further erred in relying on *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), as that case concerned the meaning of the Equal Protection Clause, not Title IX or Section 1557.

**B.** Plaintiffs are also unlikely to succeed on the merits because their challenge is premature. Plaintiffs fear the loss of federal funding based on policies that allegedly violate the Rule. But any potential future enforcement action against plaintiffs for violating the Rule depends on a series of speculative contingencies that may never come to pass. And postponing judicial review would not harm plaintiffs, given their ability

to raise these same objections in the context of HHS administrative proceedings and subsequent judicial review.

**II.**     Finally, the preliminary injunction and § 705 stay are, at a minimum, substantively overbroad.  The scope of relief issued by the district court—applying to circumstances beyond the provision or coverage of gender-affirming medical care and to sex-segregated facilities—vastly exceeded what was necessary to redress "plaintiff[s'] particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

Accordingly, this Court should vacate the district court's preliminary injunction and § 705 stay order or, at a minimum, narrow the scope of relief to remedy only plaintiffs' asserted injuries.

## ARGUMENT

## I.     Plaintiffs Are Unlikely to Prevail on the Merits of Their Challenges

### A.     Gender-Identity Discrimination Is Necessarily a Form of Discrimination on the Basis of Sex

Title IX prohibits discrimination "on the basis of sex," 20 U.S.C. § 1681(a), and Section 1557 incorporates that ground of prohibited discrimination, 42 U.S.C. § 18116(a).  Section 92.101(a)(2) of the Rule describes the scope of that prohibition, explaining that "[d]iscrimination on the basis of sex includes, but is not limited to, discrimination on the basis of: (i) Sex characteristics, including intersex traits; (ii) Pregnancy or related conditions; (iii) Sexual orientation; (iv) Gender identity; and (v) Sex stereotypes." 45 C.F.R. § 92.101(a)(2).  HHS explained that this provision addresses

a "non-exhaustive list of what constitutes discrimination on the basis of sex," and noted the Supreme Court's observation in *Bostock* that nothing in the Court's decision "turned on the debate over whether 'sex' was limited to 'biological distinctions between male and female.'" 89 Fed. Reg. at 37,575. Each form of discrimination listed in § 92.101(a)(2) necessarily involves the consideration of a person's sex, even if "sex" refers only to biological differences between sexes.

Plaintiffs' challenge here focuses on the Rule's inclusion of gender-identity discrimination as a form of sex discrimination, which is specifically provided in § 92.101(a)(2)(iv) and effectuated through various other provisions. *See* Dkt. No. 12, at 8-10 (Motion for Stay or Preliminary Injunction).[4] The district court rejected the Rule's recognition that the Supreme Court's reasoning in *Bostock*, when applied to the text of Title IX as incorporated by Section 1557, leads naturally to the conclusion that discrimination based on gender identity is necessarily a form of discrimination "on the basis of sex." *See* Dkt. No. 41, at 20-28. But the reasons the district court gave for that

---

[4] Although the district court's stay applies to various provisions of the Rule, the merits analysis as to all of those provisions for the claim on review turns on whether the prohibition on sex discrimination in Title IX, as incorporated by Section 1557, encompasses gender-identity discrimination. The other provisions affected by the district court's stay include 45 C.F.R. §§ 92.206(b) and 92.207(b)(3)-(5) (which effectuate the prohibition on gender-identity discrimination with respect to equal program access and insurance coverage), and 42 C.F.R. § 438.3(d)(4) in the CMS regulations (which requires contracts between states and Medicaid and CHIP managed care plans to provide that the plans will not discriminate based on sex, which includes, as relevant here, gender identity). Demonstrating that HHS did not exceed its statutory authority in promulgating § 92.101(a)(2)(iv) is sufficient to dispose of plaintiffs' claim at issue in its entirety.

conclusion have no foundation in the text of the statutes and cannot be squared with the Supreme Court's analysis in *Bostock*.

      **1.**     Section 92.101(a)(2)(iv) reflects a straightforward application of *Bostock*'s reasoning. There, the Supreme Court construed the provision of Title VII making it unlawful "for an employer … to discriminate against any individual … because of such individual's … sex." *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020) (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656 (quotation marks omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity, the Court explained, "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660-61 (emphasis omitted). Such discrimination would, for example, "penalize[] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. That is true even on the assumption that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

      *Bostock*'s reasoning applies with equal force to Title IX's prohibition against discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Title IX imposes a causation standard no more stringent than but-for causation under Title VII. *See Lakoski v. James*, 66 F.3d 751, 756-57, 756 n.3 (5th Cir. 1995) ("[T]he prohibitions of discrimination on the basis of sex [in] Title IX and Title VII are the same."). And as *Bostock* made clear,

"sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity. 590 U.S. at 661 (emphasis omitted). A school under Title IX (or a healthcare provider under Section 1557), no less than an employer under Title VII, engages in sex discrimination when it "penalizes a person … for traits or actions that it tolerates" in persons identified as a different sex "at birth." *Id.* at 660. That is why various courts have concluded that, in light of *Bostock*, discrimination on the basis of sexual orientation or gender identity are necessarily forms of prohibited sex discrimination under Title IX. *See, e.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir.), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). That conclusion does not depend, as HHS recognized, on viewing the term "sex" in Title IX and Section 1557 to refer anything other than "'biological distinctions between male and female.'" 89 Fed. Reg. at 37,575 (quoting *Bostock*, 590 U.S. at 655).

    **2.** None of the district court's reasons for rejecting that conclusion is valid. The district court relied on *Adams ex rel. Kasper v. School Board of St. Johns County*, 57 F.4th 791, 812-15 (11th Cir. 2022) (en banc), which the court interpreted to stand for the proposition that "Title IX does not address discrimination on the basis of gender identity." Dkt. No. 41, at 20. But *Adams* provides no support for the district court's broad conclusion that *Bostock* does not apply to Title IX or Section 1557. In *Adams*, this Court held that a school's restroom policy prohibiting a transgender male student

from using the boys' restroom did not violate Title IX, but its holding and reasoning were limited to the specific context of sex-separate facilities. 57 F.4th at 815. This Court held that the schools' restroom policy was authorized by the Title IX provisions permitting separate facilities based on sex. *Id.* This Court explained that "Title IX's implementing regulations explicitly allow schools to 'provide separate toilet . . . facilities on the basis of [biological] sex.'" *Id.* (alterations in original) (quoting 34 C.F.R. § 106.33). "The School Board does just that." *Id.* This Court thus held that "[b]ecause the School Board thus acts in accordance with Title IX's bathroom-specific regulation, its decision to direct Adams—who was born, and enrolled in the School District as, a female—to use the female bathrooms is consistent with Title IX's precepts." *Id.* Accordingly, this Court concluded that Adams's Title IX claim failed. This Court did not address in *Adams* whether Title IX prohibits gender-identity discrimination outside of the specific context of sex-separate facilities.

The district court here endorsed the notion that the meaning of the term "sex" in Title IX and in Section 1557 "unambiguously means 'biological sex' (male and female), and not 'gender identity.'" Dkt. No. 41, at 20 (quoting *Adams*, 57 F.4th at 812-813). But the Rule does not purport to redefine "sex." 89 Fed. Reg. at 37,575 ("[HHS Office for Civil Rights (OCR)] has determined it is not necessary to define 'sex' in this rule ....."). It simply applies the same reasoning that the Supreme Court applied in *Bostock* to determine that discrimination on the basis of gender identity is necessarily

discrimination on the basis of sex, even assuming a definition of sex tied to "biological distinctions between male and female." *Bostock*, 590 U.S. at 655.

The district court's observation that Title IX and its regulations contain "sex-specific exceptions" and allow sex separation in some contexts, such as separate living facilities, Dkt. No. 41, at 20-21 (first citing *Adams*, 57 F.4th at 814-815, 814 n.7; and then citing 20 U.S.C. § 1686), does not compel a different understanding as to the scope of prohibited sex discrimination in the first instance. Title VII also contains statutory exceptions, *see* 42 U.S.C. § 2000e-2(e) (bona fide qualifications), and has long been understood to allow certain forms of sex separation in certain contexts, like "sex-segregated bathrooms, locker rooms, and dress codes," *Bostock*, 590 U.S. at 681. Yet the Supreme Court nevertheless recognized that gender-identity discrimination is necessarily also sex discrimination. Indeed, the presence of statutory provisions that explicitly permit sex differentiation in certain contexts under Title IX only reinforces that Congress understood that Title IX's general prohibition against sex discrimination otherwise applies. *See Arnold, Constable & Co. v. United States*, 147 U.S. 494, 499 (1893) ("[T]he exception of a particular thing from general words proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made." (quotation marks omitted)).

Nor does the fact that Title IX and Section 1557 were enacted pursuant to the Spending Clause—whereas Title VII was enacted pursuant to the Commerce Clause— provide any basis for concluding that *Bostock*'s reasoning does not apply here. *See* Dkt.

21

No. 41, at 21, 24 n.7, 27. The district court observed that "Title IX, unlike Title VII, was enacted under the 'Spending Clause.'" *Id.* at 21 (quoting *Adams*, 57 F.4th at 815) and that Title VII "is not a Spending Clause statute like section 1557," "[s]o unlike section 1557, Title VII need not satisfy the requirement of clear and unambiguous notice," *id.* at 24 n.7. But because Title IX and Section 1557 unambiguously prohibit discrimination on the basis of gender identity, clear-statement principles premised on the Spending Clause have no bearing on the scope of prohibited discrimination in § 92.101(a)(2). As explained above, the Rule did not purport to redefine "sex" to be synonymous with gender identity. Discrimination on the basis of gender identity is necessarily also sex discrimination covered by Title IX's "starkly broad terms," *Bostock*, 590 U.S. at 680, even assuming the statute refers to "biological distinctions between male and female," *id.* at 655; *cf. Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005) (holding that Title IX's private right of action encompasses retaliation claims even though the statute does not specifically mention retaliation).

The district court's reliance on *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023), is similarly misplaced. Dkt. No. 41, at 23-26. That case concerned the meaning of the Equal Protection Clause, not Title IX. *See Eknes-Tucker*, 80 F.4th at 1228-29 (distinguishing *Bostock* by observing that "[t]he Equal Protection Clause contains none of the text that the Court interpreted" there). And nothing in *Eknes-Tucker* suggests that *Bostock's* reasoning with respect to the prohibition against discrimination "based on sex" in Title VII is limited to that statute.

The district court also dismissed *Bostock*'s relevance on the ground that the decision arose in the context of a Title VII claim, noting that *Eknes-Tucker* and this case "involve[] a law regulating medical treatments, not a rule penalizing a transgender individual in employment for no reason other than being transgender." Dkt. No. 41, at 24. But *Bostock*'s core insight—that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual *based on* sex," 590 U.S. at 660 (emphasis added)—applies equally to Title IX and Section 1557. If an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female" yet "retains an otherwise identical employee who was identified as female at birth," the employer has engaged in discrimination based on sex assigned at birth because it has "intentionally penalize[d] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* Exactly the same is true in the healthcare context: A healthcare provider that refuses to treat the broken arm of a transgender woman who was assigned male at birth because of her gender identity has engaged in discrimination "on the basis of sex," 20 U.S.C. § 1681(a), because that provider has penalized her for traits it would have tolerated in an otherwise identical patient identified as female at birth. And as the Supreme Court has made clear, lower courts are bound not only by "the holdings of … prior cases, but also to their explications of the governing rules of law." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (quotation marks omitted). Plaintiffs may disagree with what the Supreme

Court said about sex discrimination in *Bostock*, but there is no basis for refusing to apply its reasoning to a statute with functionally identical text.

The district court focused on the causation language used in Title IX, emphasizing that "*Eknes-Tucker* held that a ban on gender-transition interventions does not intentionally discriminate 'on the basis of sex'" and that "[t]he same phrase is used in Title IX and imported into section 1557." Dkt. No. 41, at 24. But the court nowhere explained how Title VII's prohibition on discrimination "because of" sex means something different than Title IX's prohibition on discrimination "on the basis of" sex. In *Bostock* itself, the Supreme Court substituted the phrase "on the basis of" for Title VII's "because of" formulation at least eight times. *See, e.g.*, 590 U.S. at 650 (noting that "in Title VII, Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin" (emphasis added)); *see also Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (explaining that Title IX imposes "the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate *because of* the subordinate's sex, that supervisor "discriminate[s]" *on the basis of* sex'" (alteration in original) (emphases added) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986))); *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 918 (5th Cir. 2023) (explaining *Bostock*'s holding that Title VII bars discrimination based on sexual orientation because it is "discrimination … '*on the basis of* sex'" (emphasis added)); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000) (explaining that a Title IX violation is present where an "institution intended to treat women differently *because*

*of* their sex" (emphasis added)).    And in other contexts, the Supreme Court has explained that the ordinary meaning of "the phrase 'based on' indicates a but-for causal relationship" and that the phrase has "the same meaning as the phrase, 'because of.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quotation marks omitted).

The district court reasoned that denying or limiting medical treatment "sought for purpose of gender transition" and permitting those services for "other purposes" is "insufficient to establish a prima face discrimination claim, as a patient seeking gender transition is not similarly situated to a patient seeking a drug or procedure to treat a different medical condition or diagnosis."    Dkt. No. 41, at 24-25 (quotation marks omitted).    But as the Supreme Court explained in *Bostock*, when a law or policy "penalizes a person identified as male at birth for traits or actions that it tolerates in a [person] identified as female at birth," the person's "sex plays an unmistakable" role. 590 U.S. at 660.    Thus, if a patient assigned female at birth cannot receive puberty blockers or testosterone to live as a male, but a patient assigned male at birth can, and vice versa, then the patient's "sex at birth determines whether or not the [patient] can receive certain types of medical care," and this denial of gender-affirming care necessarily "discriminates on the basis of sex."    *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022).

## B.    Plaintiffs' Challenge Is Unripe

Article III of the United States Constitution limits federal courts' jurisdiction to "Cases" and "Controversies."    U.S. Const. art. III, § 2, cl. 1.    "The ripeness doctrine is

one of the several strands of justiciability doctrine that go to the heart of the Article III case or controversy requirement." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1291 (11th Cir. 2010) (citation and alteration omitted). The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).

In order to assess whether a particular claim is ripe for judicial review, this Court considers both (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding judicial review." *Mulhall*, 618 F.3d at 1291 (quotation marks omitted). A court should dismiss a case for lack of ripeness when the case is "hypothetical or abstract." *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). If a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is not ripe for adjudication. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (quotation marks omitted).

In concluding that plaintiffs' challenge was ripe, the district court reasoned that plaintiffs' claims are fit for judicial decision because "Plaintiffs' central challenge is purely legal in nature" and there is thus "no need for trial-like factual development at this stage." Dkt. No. 41, at 16. But the Supreme Court has explained that even when

"the question presented" is "purely legal," it is unfit for adjudication where a concrete factual context would facilitate a court's "ability to deal with the legal issues presented." *National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 812 (2003) (quotation marks omitted). And here, a concrete factual context would facilitate the court's ability to assess plaintiffs' challenge to the Rule.

The district court also reasoned that plaintiffs "would suffer hardship without judicial review," asserting that "the Rules force Plaintiffs to choose between foregoing ostensibly legal healthcare policies and practices or risking private lawsuits and the withholding of federal funds that are likely unrecoverable." Dkt. No. 41, at 16-17. But to determine whether the exclusion of coverage for gender-affirming care in plaintiffs' policies actually violates the Rule requires significant further factual development. And plaintiffs' feared loss of funding or private lawsuits for violating the Rule is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Thomas*, 473 U.S. at 580-81 (quotation marks omitted). Accordingly, this challenge is unripe.

As the Rule makes clear, it "does not impose a categorical requirement that covered entities must provide gender-affirming care." 89 Fed. Reg. at 37,596. Nor does it "specify whether certain benefit design practices are per se discriminatory." *Id.* at 37,614. Instead, the Rule provides that healthcare providers and insurers can decline to provide or cover health services where they have a "legitimate, nondiscriminatory reason for denying or limiting" provision or coverage of "that service" and the

determination or coverage denial is not "based on unlawful animus or bias," and does not "constitute a pretext for discrimination." 45 C.F.R. §§ 92.206(c), 92.207(c). This includes circumstances where the covered provider "reasonably determines that such health service is not clinically appropriate for a particular individual," *id.* § 92.206(c), or where the covered insurer employs "reasonable medical management techniques such as medical necessity requirements," *id.* § 92.207(c). Where a "medical necessity determination" to deny coverage constitutes a "bona fide medical judgment," it would not amount to impermissible discrimination under the Rule. *See* 89 Fed. Reg. at 37,613.

The Rule thus draws a careful line between denying gender-affirming care as the result of reasonable medical determinations—which is permissible—and denying such care as the result of animus—which is not. And in policing that line, as the Rule explains, the determination by OCR "of whether a challenged action is discriminatory is necessarily a fact-specific, case-by-case analysis dependent on the facts of the particular situation." 89 Fed. Reg. at 37,616. Providers and insurers thus have the opportunity "to articulate a legitimate, nondiscriminatory justification for an alleged discriminatory action, which OCR will scrutinize to ensure it is not a pretext for discrimination." *Id.*

Plaintiffs do not allege that HHS has engaged in this fact-specific, case-by-case analysis under the Rule with respect to any of their health programs and their approach to the provision or coverage of gender-affirming care. Nor do they allege that HHS has even initiated the extensive administrative process that would need to precede any

suspension of federal funding for violating the Rule. HHS's enforcement under Section 1557 through OCR is typically a complaint-driven process, though OCR also has authority to initiate investigations on its own. *See* 45 C.F.R. § 80.7; *see also id.* §§ 86.71, 92.5(a). As part of an investigation, OCR considers all "factors relevant to a determination as to whether the recipient has failed to comply" with Section 1557's requirements, *id.* § 80.7(c), including any bona fide medical judgments regarding the medical necessity of treatment. If an investigation finds a "failure to comply," OCR must attempt to secure voluntary compliance through informal means. *Id.* § 80.7(d)(1). If such efforts fail, OCR makes a written finding that the recipient is in violation of the requirements of Section 1557 and makes further attempts at voluntary resolution. *Id.* § 80.8(d). If these prove unsuccessful, OCR can either refer the matter to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce Section 1557's requirements or begin administrative proceedings to suspend or terminate federal financial assistance. *Id.* § 80.8(a), (c). To terminate federal funding, specifically, OCR must conduct a formal administrative hearing and provide 30 days' advance notice to the relevant congressional committees, including "a full written report of the circumstances and the grounds for such action." *Id.* § 80.8(c); *see id.* § 80.9 (hearing requirements). A final decision to suspend or terminate funding resulting from these administrative proceedings is subject to judicial review. *Id.* § 80.11; *see* 20 U.S.C. § 1683 (incorporated by 42 U.S.C. § 18116(a)).

On the basis of plaintiffs' allegations, it is entirely speculative at this point whether OCR will initiate any investigation under the Rule into the handling of gender-affirming care in plaintiffs' health programs, what plaintiffs' asserted justifications would be for their policies, whether OCR would find that any such justification was actually a pretext for discrimination and that the programs were in violation of the Rule, and whether efforts at informal, voluntary compliance would be unsuccessful. Then, and only then, would plaintiffs potentially be subject to an enforcement action by the federal government for violating the Rule. Because these "contingent future events … may not occur as anticipated, or indeed may not occur at all," plaintiffs' challenge is premature. *Thomas*, 473 U.S. at 580-81 (quotation marks omitted).

Postponing any judicial review until after HHS has pursued this administrative process, when plaintiffs' feared harms of losing federal funding become more than merely speculative, would cause no hardship. "[M]ere uncertainty" does not "constitute[] a hardship for purposes of the ripeness analysis." *National Park*, 538 U.S. at 811. In the event OCR ever does initiate an investigation into their healthcare programs for violating the Rule, plaintiffs would have the ability to raise their arguments in that administrative proceeding and subsequent judicial review. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30, 733-34 (1998) (holding that case was not ripe where the plaintiff "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain," and noting that there would be an administrative process before plaintiffs would face any "practical harm").

The district court thus erred in permitting plaintiffs to prematurely obtain judicial review of their Administrative Procedure Act challenge premised on the speculative and contingent fear that they will lose federal funding for their health programs.

## II. At a Minimum, the Injunction and Stay Are Overbroad

The district court erred in staying and enjoining enforcement of the Rule's challenged provisions in their entirety because the breadth of this relief was not necessary to remedy plaintiffs' asserted injuries and thus violates the traditional principle that equitable relief should be no "more burdensome to the defendant than necessary" to redress the plaintiffs' injuries. *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 927 (2024) (Gorsuch, J., concurring in the grant of stay) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

By attacking HHS's understanding of the scope of discrimination "on the basis of sex"—as expressly reflected in § 92.101(a)(2)(iv)—plaintiffs claim that they can "discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660. On plaintiffs' view, it would be perfectly lawful under Title IX and Section 1557 for them to punish transgender patients "simply for being … transgender," *id.* at 651, by, for example, barring them from receiving treatment for a broken arm. Plaintiffs have never suggested they wish to engage in such plainly discriminatory conduct or that they would be harmed by being required to refrain from it. Rather, they only claim harms related to the coverage and provision of gender-affirming medical treatment and sex-segregated facilities.

The district court reasoned that to comply with the Rule, plaintiffs would need to alter their policies and violate state law to expand coverage for gender-transition services and will thus "clearly suffer irreparable harm if the Rule is not stayed." Dkt. No. 41, at 29; *see also* Dkt. No. 12, at 20-23 (Motion for Stay or Preliminary Injunction) (identifying harms related to "gender-transition" services); Dkt. No. 35, at 11-15 (Reply in Support of Motion for Stay or Preliminary Injunction) (same). The court also noted that "the Rule provides nothing for the vast added, unallotted expense" related to covering "gender change services" and that "these costs can never be recovered," explaining that "[u]nrecovered monetary loss is irreparable harm." Dkt. No. 41, at 29-30. The court further reasoned that plaintiffs faced irreparable harm because they would have to change their policies regarding room assignments in "residential living facilities on the basis of biological sex, regardless of an individual's gender identity." *Id.* at 30. The court also credited Florida's assertion of a sovereign "interest in enforcing [its] duly enacted laws without contradiction from the federal government." *Id.* at 31 (alteration in original) (quotation marks omitted).

Even assuming that some relief were appropriate here, plaintiffs' specific alleged harms could be remedied by staying the effective date of the identified provisions of Rule and enjoining their enforcement only insofar as they apply to the coverage or provision of gender-affirming medical treatments and sex-separate facilities. With respect to the substantive scope of relief, there would be no need for the district court to stay the identified provisions of the Rule and enjoin their enforcement more broadly.

32

The district court thus abused its discretion in granting relief against the identified provisions of the Rule in their entirety rather than tailoring relief more narrowly to focus on plaintiffs' asserted harm regarding the provision and coverage of gender-affirming medical care and sex-separate facilities.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction and stay order. Alternatively, this Court should narrow the scope of relief to plaintiffs' specific asserted injuries related to gender-affirming medical care and sex-separate facilities.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

CHARLES W. SCARBOROUGH

 *s/ Ashley C. Honold*
ASHLEY C. HONOLD
  *Attorneys, Appellate Staff
  Civil Division, Room 7261
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 353-9018
  ashley.c.honold@usdoj.gov*

January 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,515 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Ashley C. Honold*
Ashley C. Honold

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

*s/ Ashley C. Honold*
Ashley C. Honold

# ADDENDUM

# TABLE OF CONTENTS

42 U.S.C. § 18116 ..................................................................A1

20 U.S.C. § 1681 ...................................................................A1

5 U.S.C. § 705.......................................................................A2

**42 U.S.C. § 18116**

**§ 18116. Nondiscrimination**

**(a) In general**

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

**(b) Continued application of laws**

Nothing in this title (or an amendment made by this title) shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of Title 29, or the Age Discrimination Act of 1975, or to supersede State laws that provide additional protections against discrimination on any basis described in subsection (a).

**(c) Regulations**

The Secretary may promulgate regulations to implement this section.


**20 U.S.C. § 1681**

**§ 1681. Sex**

**(a) Prohibition against discrimination; exceptions**

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

* * * *

**5 U.S.C. § 705**

**§ 705. Relief pending review**

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.